IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **MEMBERSELECT INSURANCE** | ) | |
| **COMPANY**, a/s/o **CHRIS** AND | ) | |
| **RENATA LOIOTILE,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 13 C 4097 |
| vs. | ) | |
| | ) | District Judge Marvin E. Aspen |
| **ELECTROLUX HOME PRODUCTS,** | ) | Magistrate Judge Sidney I. Schenkier |
| **INC.,** a Delaware corporation, | ) | |
| **SEARS HOLDING CORPORATION,** | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff MemberSelect Insurance Company ("MemberSelect") (as subrogee of its insureds, Chris and Renata Loiotile ("Loiotiles")), filed this lawsuit against Sears Holding Corporation ("Sears") and Electrolux Home Products, Inc. ("Electrolux"), seeking to recover $524,689.34 that MemberSelect paid to the Loiotiles for losses resulting from a fire on March 24, 2010. MemberSelect alleges that the fire originated in a dryer manufactured by Electrolux, and sold and serviced by Sears. In the amended complaint, MemberSelect asserts claims of strict liability and negligence against both Electrolux and Sears, and additionally asserts a breach of warranty claim against Sears.

MemberSelect has filed a motion seeking a default judgment and other relief against defendant Sears (doc. # 123: Pl. Sanctions Mot.). MemberSelect seeks those sanctions based on the failure of Sears to produce certain information until May 21, 2015, when Sears filed a motion for summary judgment on the claims against it by MemberSelect and a motion for leave to file a cross-complaint against its co-defendant, Electrolux (doc. # 112: Def. Mot. for Leave to File

Cross-Complt.). In support of its summary judgment motion, Sears filed an affidavit from Chang Hyun Lee, Laundry Engineer Manager for Product Development for Sears (doc. # 113-1: Lee Aff.), an individual who was not identified in Sears's Rule 26(a)(1) disclosures or in its responses to discovery requests by MemberSelect. And, as part of its motion for leave to file a cross-claim, Sears attached two contracts with Electrolux -- a Universal Terms and Conditions ("UTC") Agreement and a Vendor Supply Agreement -- that Sears had never produced during discovery (Mot. for Leave to File, Exs. A, B).

MemberSelect's motion has now been fully briefed, and on July 31, 2015, the Court heard oral argument. For the reasons that follow, we find that Sears has failed to offer any satisfactory explanation for its failure to provide the information at issue far earlier in the case. As a result, we conclude that sanctions are appropriate here. That said, we also conclude that the imposition of a default judgment is not warranted. There are curative measures well short of imposing this ultimate sanction that will be effective in addressing the merits and financial prejudice to MemberSelect that has resulted from Sears's conduct, and in deterring the kind of conduct exhibited by Sears in this case.

## I.

As outlined above, MemberSelect's motion is based on Sears's failure to provide two categories of information, either during the discovery process or for several months thereafter until Sears filed its motion for summary judgment and for leave to file a cross-claim against Electrolux. We address separately each of the categories of information.

## A.

We begin with Sears's submission of Mr. Lee's affidavit as part of its summary judgment motion. In that affidavit, Mr. Lee attests that at no time did Sears "direct, control, or regulate

Electrolux in the design or manufacture of the subject dryer;" or "provide instructions or warnings to Electrolux relative to the alleged defects in the subject dryer;" or "have any actual knowledge of the alleged defects;" or "create any of the alleged defects" (Lee Aff. ¶¶ 5-8). Sears cited Mr. Lee's affidavit as evidence that Sears did not exercise any significant control over the design or manufacturer of the allegedly defective dryer, and that as a result, it is entitled to summary judgment on plaintiff's strict liability claim (doc. # 111: Sears's SJ Mem. at 3-4). Sears also cited to Mr. Lee's affidavit as support for its argument that plaintiff's negligence claim must fail, because Sears could not have had a duty to safeguard against dangers that it was not aware of and had no role in creating (*Id.* at 12).

Despite the prominent (although not exclusive) role that Mr. Lee played in Sears's summary judgment submission, his identity was never disclosed during the course of discovery. Sears did not identify Mr. Lee in its amended initial disclosures on March 7, 2014 (doc. # 44). Nor did Sears list Mr. Lee in its April 9, 2014 response to Interrogatory Number 2 served by MemberSelect, which asked Sears to identify each person "that has knowledge of the facts in this case and state in detail what knowledge each person possesses" (Pl.'s Sanctions Mot., Ex. A, at 1.) Sears protests that it had no obligation to identify Mr. Lee in its initial disclosures or in its response to the interrogatory because, at that time, MemberSelect had not "better articulated its theories of liability" and thus Sears did not know that Mr. Lee was a person with knowledge relevant to the case, much less one whom Sears would potentially call to testify at trial (doc. # 130: Sears' Sanctions Resp. at 6-7). Sears asserts that it was not until plaintiff's expert, Michael Stoddard, testified in January 2015 that Sears understood that plaintiff claimed Sears knew or should have known about the alleged design defect, and that Mr. Lee was therefore a person with

relevant information (*Id*. at 7-8). This explanation fails to provide a justification for Mr. Lee's late disclosure for two reasons.

*First,* plaintiff's complaint was not so ill-formed at the inception that Sears was unaware that MemberSelect claimed that Sears had knowledge of design defects. To the contrary, Sears acknowledges (Sears's Sanctions Resp. at 5) that the amended complaint, filed on July 9, 2013, alleged that when Sears sold the dryer it had actual knowledge of "the unreasonable fire hazard posed by the ball hitch design that Electrolux utilized to manufacture the subject dryer and that the defective design caused the dryer to operate in a manner that allowed lint to accumulate close to the dryer's gas heat source" (doc. # 19: Amended Complaint ¶ 46). Mr. Lee's summary judgment affidavit disclaims that very allegation, by asserting that Sears "did not have any actual knowledge of the alleged defects of the subject dryer" (Lee Aff., ¶ 7), or any role in the design or manufacturer of the dryer (*Id*. at ¶ 5). Those assertions in Mr. Lee's affidavit were plainly relevant to the allegations in the amended complaint filed in July 2013. Perhaps Sears could be excused from identifying Mr. Lee in the Rule 26(a)(1) disclosures, if as of March 2014 Sears truly did not consider him to be someone whom Sears knew it might use to defend against the claim. Fed. R. Civ. P. 26(a)(1)(A)(i) (a party must identify "each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to supports its claims or defenses . . ."). But, Sears was obligated in April 2014 to disclose Mr. Lee in response to MemberSelect's interrogatory.

*Second,* even if we accepted the mistaken premise that Mr. Lee's knowledge became relevant to the case only as of the time of the Stoddard deposition in January 2015, Sears still has offered no good reason for failing to disclose his identity or his knowledge at any time prior to filing the summary judgment motion on May 21, 2015. Rule 26(e) requires that a party

supplement its initial disclosures or interrogatory responses "in a timely manner" if the prior disclosure or response was "incomplete," and the additional information "has not otherwise been made known to the other parties during the discovery process or in writing." We recognize that non-retained fact discovery closed on October 31, 2014 (doc. # 61: 09/02/14 Order). However, a party's obligation to supplement discovery under Rule 26(e) does not end when discovery closes. *Episcopo v. General Motors,* No. 02 C 8675, 2004 WL 628243 at *7 (N.D.Ill. March 29, 2004). What's more, expert discovery in the case did not conclude until February 27, 2015 (doc. # 101: 01/05/15 Order). Disclosure of Mr. Lee immediately after the Stoddard deposition would have allowed MemberSelect to seek additional limited discovery into Mr. Lee's sworn assertions that Sears lacked knowledge of the design of the subject dryer or about any alleged defects (an inquiry, that as we explain below, would have been aided by the contractual documents that Sears also failed to produce during discovery). Indeed, during oral argument, counsel for Sears acknowledged that Sears should have identified Mr. Lee, if not sooner, at least in an amended Rule 26(a)(1) disclosure (doc. # 141: 07/31/15 Tr. at 14-15).

In sum, there is no excuse for Sears's failure to disclose Mr. Lee until filing his affidavit as part of Sears's summary judgment motion. The late disclosure deprived MemberSelect of any chance to probe into Mr. Lee's statements prior to the filing of dispositive motions, which plainly caused prejudice to MemberSelect.

**B.**

We now consider the two contracts that Sears filed as part of its motion for leave to file a cross-claim against Electrolux: the UTC and the Supply Agreement. Sears attached these contracts to the motion in order to establish a claim that Electrolux breached its contractual duty to defend and indemnify Sears for the claims raised by MemberSelect. These contracts were not

produced to MemberSelect during discovery, even though they were responsive to discovery requests by MemberSelect.

In particular, MemberSelect's Document Request No. 20 asked for any indemnity agreements between Sears and Electrolux. In response, Sears posed a number of objections, including relevance, which lead to a filing of a motion to compel by MemberSelect. In response to the motion for sanctions, Sears reiterates its claim that it was entitled to withhold those documents from production based on relevance (Sears' Sanctions' Resp. at 3-4).

At the threshold, during a hearing on the motion to compel held on November 19. 2014, Sears represented to the Court that it was not withholding any documents based on the objections it made, including relevance. In its response to the sanctions motion (Sears's Sanctions Resp. at 4), Sears argues that it told the Court it was not withholding any *relevant* documents. However, the transcript of the proceedings shows that Sears did not limit its representation in that fashion. To the contrary, in response to the Court's question as to whether Sears was "withholding any documents because of the objections you made that you would have produced had you not made the objections," Sears answered unequivocally: "no…. no documents are being withheld based on the objections that we made" (doc. # 138: 11/19/14 Tr. at 23). In fact, that was not the case; Sears withheld the UTC and the Supply Agreements from production. Even if Sears considered those contracts to be irrelevant, based on the representations of the Court, Sears was obligated to produce them.

After filing its written response to the sanctions motion, Sears's counsel reviewed (apparently for the first time) the November 19 transcript, which makes clear that Sears represented it was not just producing documents it considered relevant but was producing documents even when it posed relevance objections. At oral argument, Sears shifted from the

position it asserted in its written response to the motion. Sears acknowledged that it told the Court it was not holding back documents based on its objections, but said that representation applied only to document requests where Sears produced some documents subject to objection and not to requests (like Document Request No. 20) where Sears objected and did not produce any documents (07/31/15 Tr. at 9-11). Perhaps that was what Sears's counsel subjectively thought and, in fairness, the discussion on this point started off as a discussion of Sears's responses to certain discovery requests where it objected to producing documents and then nonetheless stated that it was producing documents subject to and without waiving objections (11/19/15 Tr. at 22). But, we are not entirely convinced that was so; indeed, that plainly was not how the Court – or plaintiff – interpreted the defendant's statement. It was based on that statement that the Court did not rule on the relevance objection to production of the indemnity agreements.

Moreover, during a hearing on December 17, 2014, the Court addressed a dispute with the parties over plaintiff's request for production of service agreements between Sears and Electrolux. During that hearing, plaintiff argued that while Sears had produced an April 2006 service agreement with Electrolux, it had not produced service agreements prior to that date – in particular, one that plaintiff believed was dated May 2003 (the Loitiles had purchased the dryer at issue in 2003). Counsel for Sears argued that it could not produce any prior agreements because it had done a search and could not find any service agreement from 2003 (doc. # 139: 12/17/14 Tr. at 6). As a result, the Court ordered that by January 7, 2015, Sears either produce the May 2003 service agreement or a declaration stating that after a reasonable search it had been unable to locate one (doc. # 96: 12/17/14 Order). Although we have not seen it, we understand Sears provided the required declaration stating it could not locate such a contract.

That statement is literally correct, as the Supply Agreement that Sears filed as part of its motion for leave to file a cross-claim is not dated May 2003 – but, that is of limited assistance to Sears, as that agreement states that it was effective as of January 1, 2004. We see no basis for Sears to have been willing to produce a May 2003 agreement had it found one, but then to assert that the 2004 Vendor Supply Agreement and the UTC Agreement (which is dated March 19, 2002) are irrelevant.

And, indeed, we disagree with the proposition that these contracts are irrelevant. If the UTC and the Supply agreements had indemnity provisions in them and nothing else, a relevance objection would have merit. As MemberSelect agreed during oral argument (07/31/15 Tr. at 4-5), such an indemnity agreement would not be relevant to its claims. But, the UTC and Supply Agreements contain other terms that plainly are relevant to the claims in the case.

The UTC Agreement gives Sears the right to receive from Electrolux information about the methods of manufacturing products, as well the right to inspect any production facility and the merchandise being manufactured (UTC Agreement, ¶ 6). The Supply Agreement gives Sears the right to require that Electrolux manufacture products for Sears according to specifications set forth in that agreement (Supply Agreement, ¶ 12.A); to approve any changes to products specifications (*Id.* ¶ 12.E); and to require that testing of the products be done pursuant to a protocol approved in advance by Sears (*Id.* at ¶12.A). Both agreements provide that Electrolux would provide training and other information necessary for Sears to install and service the products manufactured for it by Electrolux (UTC ¶ 7.2; Supply Agreement ¶ 14.D).

These contracts provide terms that were not in the 2006 agreement that Sears produced (doc. # 135: MemberSelect Reply, at 2), and can be read as indicating that Sears was more than simply a passive acquirer of the dryer manufactured by Electrolux, but instead was intimately

involved in and knowledgeable about the product design. If so, MemberSelect might be able to argue that these contractual rights conflict with Mr. Lee's assertion and Sears's summary judgment argument that it did not exercise control over the design or manufacture of the dryer (Lee Aff., ¶ 5; Sears's SJ Mem. at 3-4). Perhaps Mr. Lee would say that Sears never exercised its contractual rights to dictate product specifications, or to inspect the manufacturing process and the products that were produced pursuant to it. But, the failure of Sears to produce the contracts deprived MemberSelect of the ability to use the contracts during the discovery process to probe those matter, in order to determine whether in fact Sears exercised those rights and, if not, why not. We express no view as to whether the information that plaintiff would have obtained through that process ultimately would enable it to carry the day on its claims in this case. However, we have no question but that MemberSelect was entitled to have the contracts during the discovery process, and that Sears should have produced them.

## II.

The Rules of Civil Procedure impose a number of disclosure obligations on the parties. Federal Rules of Civil Procedure 26(a)(1) and (e) require parties to provide initial disclosures and then to supplement them as appropriate, even without a request by the opposing party. Other provisions, such as Federal Rules of Civil Procedure 33 and 34, obligate parties to provide fair and complete responses to interrogatories and document requests served by an opponent. And, when a lawyer signs an initial disclosure or discovery response, the lawyer certifies that any objection is supported by "existing law or by a non-frivolous argument for extending, modifying, or reversing existing law, or for establishing new law." Fed.R.Civ.P. 26(g)(1)(A). These rules are part of a carefully constructed framework that is designed to enhance the fairness of the

litigation process by avoiding a trial (or summary judgment) by ambush. *See, Andrews v. CBOCS West, Inc.*, No. 09-cv-1025, 2011 WL 722606 at *3 (S.D.Ill. February 23, 2011).

As is clear from the forgoing discussion, we conclude that Sears has not been faithful to the obligations imposed by the Rules of Civil Procedure. Sears did not disclose the identity of Mr. Lee or the UTC and Supply Agreements until long after discovery, when it filed a motion for summary judgment. Sears should have produced that information much earlier in the case.

With respect to Mr. Lee, we disagree with Sears's argument that it did not know prior to the Stoddard deposition that Mr. Lee was somebody who had knowledge relevant to the case. From at least the time of the amended complaint filed on July 9, 2013, plaintiff alleged that Sears had knowledge of a defect in the dryer. Mr. Lee's affidavit spoke directly to that allegation: from his vantage point of his status as Laundry Engineer Manager for Product Development for Sears, Mr. Lee flatly denied that Sears had any such knowledge. Contrary to Sears's suggestion (Sears's Sanctions Resp. at 5), the fact that Sears disclosed two technicians (Messrs. Netzter and Skarzyknski) and a Rule 30(b)(6) witness (Mr. Francowski) who testified that they (and Sears) had no knowledge of any design defect did not relieve Sears of its duty to disclose Mr. Lee – a witness whom Sears considered important enough that Sears chose to include his affidavit on the motion for summary judgment, notwithstanding the testimony of these other individuals.

We are not prepared to say that when Sears made its Rule 26(a)(1) disclosures in 2014, it was obligated to identify Mr. Lee; perhaps at that time, Sears had not decided that Mr. Lee was a person whom it "may use" to support its defenses. However, we see no legitimate basis for Sears's failure to identify Mr. Lee in response to Interrogatory No. 2, particularly when it identified other persons who testified that Sears had no knowledge of the alleged defect. As

Sears conceded during oral argument, it should have disclosed Mr. Lee in a Rule 26(e) supplement well before it filed for summary judgment in May 2015.

Turning to the UTC and the Supply Agreements, those contracts plainly were responsive to Interrogatory No. 20. The UTC and Supply Agreements contain not only indemnity provisions, but a number of other terms that speak directly to the relationship between Sears and Electrolux with respect to product specifications, the manufacturing process, rights of inspection, and service and training. All of those terms *could* (and, we emphasize, *could*) be important to plaintiff's claim that Sears had knowledge of the alleged defects. The agreements show that Sears reserved for itself the right to dictate the product specifications, which could not be changed without Sears's approval; to inspect the manufacturing process; and to receive all information from Electrolux that was needed to install and service the dryer.

The fact that Sears obtained those contractual rights could suggest that Sears may have been more intimately involved in the design and manufacture of the dryer than Mr. Lee claimed, and thus more likely to have had knowledge of and responsibility for the alleged defects (if there were defects). Further probing into the subject may show that Sears did not exercise all or any of those rights, despite having bargained for them in the contract with Electrolux. But, plaintiff should have had these contracts when they examined the technicians who said they lacked knowledge of any defect, and the Sears Rule 30(b)(6) witness who testified that Sears had no knowledge of the defects. And, plaintiff should have had the opportunity to examine Mr. Lee with the contracts.

### III.

We now address the sanctions that are appropriate in light of the failure of Sears to disclose Mr. Lee and to produce the agreements in a timely fashion. As a sanction for failure to

comply with a Court order (which is implicated by Sears not producing the contract despite the representation it made to the Court), Rule 37(b)(2) provides for a payment of attorneys' fees and costs, as well as variety of increasingly serious merits-based sanctions up to and including entry of a default judgment. The same sanctions are available where a party has failed to make a required initial disclosure for a supplementation under Rule 26(e). *See* Fed.R.Civ.P. 37(c)(1). And, even where a particular category of conduct may not clearly trigger the sanctions available under Rule 37, a Court's inherent authority is available to fill the gap by providing the power necessary to impose an appropriate sanction. *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003), *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991).

As a sanction, plaintiff seeks the civil litigation equivalent of the death penalty: entry of a default judgment against Sears. In the briefing, plaintiff offered no lesser alternative to that request. During oral argument, when pressed by the Court, plaintiff grudgingly offered the "lesser" sanction of striking all of Sears's defenses and telling the jury that Sears hid information (07/31/15 Tr. at 7), which we view as the last stop on the road to a default judgment. For its part, Sears says no sanctions are appropriate, except for perhaps the removal of Mr. Lee's declaration from consideration on summary judgment. We disagree with both of these polar opposite positions.

Plaintiff's request for entry of a default judgment runs contrary to the Seventh Circuit's "well established policy favoring a trial on the merits over a default judgment." *Sun v. Board of Trustees of University of Illinois,* 473 F.3d 799, 811 (7th Cir. 2007). Default judgment is reserved only for "extremely" situations, when "other less drastic sanctions have proven unavailing." *Id.* To put it another way, entry of a default judgment is "a weapon of last resort." *Id.*

Consistent with this strong preference for decisions on the merits, default is a sanction that this Court would not choose unless either (1) the prejudice caused by Sears's conduct was so severe that it compromised plaintiff's ability to establish their claim and cannot be remedied other measures, or (2) the misconduct is so severe and so corrosive of the integrity of the system that, by engaging in that conduct, Sears has forfeited its right to a judgment on the merit. In all cases, "the court should consider the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Dotson*, 321 F.3d at 667. In our judgment, neither of these considerations weighs in favor of entry of a default judgment or any other kind of merits-based sanction.

We first address the question of prejudice. As we see it, the failure of Sears to disclose Mr. Lee and to produce the agreements caused prejudice to plaintiff in essentially three forms: (1) it placed plaintiff behind the proverbial eight-ball in responding to a summary judgment motion that utilized statements of an important witness (Mr. Lee) whom plaintiff never had the opportunity to depose; (2) it deprived plaintiff of an opportunity to examine Mr. Lee, and to have relevant documents when it examined Mr. Lee and other defense witnesses about Sears's knowledge of the alleged defect; and (3) it resulted in the plaintiff expending attorneys' fees and costs in responding to that motion and in pursuing the motion for sanctions. None of that prejudice is irremediable. To the contrary, the prejudice to having to respond to the summary judgment motion can be addressed by striking the summary judgment motion. MemberSelect's inability to depose Mr. Lee can be rectified by requiring Sears to present him for deposition; and, the inability of MemberSelect to use the contracts in examining the Rule 30(b)(6) witness and the two technicians who testified about lack of knowledge concerning the alleged defects can be addressed by requiring Sears to present them for further deposition limited to questions based

on the documents that were not timely produced.  Finally, the financial prejudice caused by MemberSelect incurring attorneys' fees and costs for the summary judgment briefing and for pursuing the sanctions motion can be addressed by requiring Sears to reimburse MemberSelect for the reasonable attorneys' fees and costs incurred in those endeavors.

We further conclude that Sears's conduct was not so extreme or pervasive that more serious sanctions are appropriate as a punishment.  The Court made a number of prior rulings on discovery matters, which largely resulted in split decisions:  MemberSelect prevailed on some of its arguments, but by no means on all of them.  The Court's ruling on the privilege log dispute was also a split decision; we held that many of the logged entries were privileged, although some were not.  We are troubled by the circumstances of Sears's failure to produce the agreements: the representation of Sears that no documents were being withheld based on objections when that plainly was the case, and then the statement that it could not locate a 2003 agreement with Electrolux when Sears knew it had a 2002 UTC Agreement and a 2004 Vendor Agreement. However, in viewing the totality of the circumstances, we conclude that Sears's conduct does not warrant sanctions beyond those necessary to redress the prejudice caused to MemberSelect.

We therefore recommend that as a sanction for the conduct of Sears, the Court strike the pending summary judgment motion; and that Sears pay reasonable attorneys' fees and costs expended by MemberSelect in connection with the summary judgment briefing and with pursuing this motion for sanctions.  We further recommend that discovery be reopened for the limited purpose of: (1) allowing plaintiff to depose Mr. Lee and allowing plaintiff to re-depose Messrs. Netzer, Skarzyknski and Francowski (in his capacity as a Rule 30(b)(6) witness) solely with respect to the extent to questioning based on the contract rights afforded in the UTC and

14

Supply Agreements, and (2) allowing plaintiff to depose an additional Rule 30(b)(6) witness on the question of how Sears implemented the relevant terms of the UTC and Supply Agreements.

We find support for the approach we recommend in *Rosenthal Collins Group, LLC v. Trading Technologies International, Inc.,* No. 05 C 4088, 2007 WL 844610 (N.D.Ill. March 14, 2007). In that case, Rosenthal Collins Group ("RCG") had filed a motion for summary judgment in April 2006, relying on the declaration of its consultant, Walter D. Buist, who developed the source code for the software at issue in the litigation. In aid of that summary judgment motion, RCG used an exhibit of certain "zip disks" alleged to contain the source code that RCG asserted was written in 1998-99, items that had not previously been produced and that were inconsistent with Mr. Buist's deposition testimony that he had actually added the source code in December 2005. Based on these inconsistencies, Trading Technologies filed a motion for default judgment and monetary sanctions. The district judge presiding at the time, the Honorable James B. Moran, stated that in light of the inconsistencies, RCG's motion for summary judgment was "somewhat misleading, could be deemed disingenuous, and at the very least was prematurely filed," but found that the evidence before him failed to show that RCG or Mr. Buist had "willfully and intentionally fabricated evidence to deceive this Court or the judicial system." 2007 WL 844610 at *6. Although Judge Moran did not enter the default judgment sought by Trading Technologies, he struck RCG's summary judgment motion with leave to file at a later time; ordered RCG to pay costs associated with the motion for sanctions; and granted Trading Technologies the right to conduct certain further discovery. *Id.* at *6-7.

The later discovery showed that, in fact, Mr. Buist had intentionally fabricated evidence. Mr. Buist testified that he had "turned back the clock" on the zip disks containing the source code so that it would appear as though RCG had written the software prior to the critical date for

Trading Technologies' patent, and that he knew his actions would conceal that the source code files had been modified in 2006 rather than in 1998 or 1999. *Rosenthal Collins Group, LLC v. Trading Technologies Intl., Inc.*, No. 05 C 4088, 2011 WL 722467 (N.D.Ill. February 23, 2011). The additional discovery also revealed RCG had eliminated evidence from other disks relevant in the litigation. 2011 WL 722467, at *3. Based on this additional evidence, Trading Technologies filed a second motion for default judgment and monetary sanctions. The judge presiding in the case at that time, the Honorable Sharon Johnson Coleman, granted that motion: she entered a default judgment in favor of Trading Technologies, dismissing RCG's complaint with prejudice. In addition, Judge Coleman struck RCG's defenses to Trading Technologies' counterclaim. *Id.* at *14. Judge Coleman explained that monetary sanctions alone would be insufficient because earlier sanctions had not deterred RCG's conduct, and that the conduct of RCG had resulted in "the destruction of relevant evidence, the waste of judicial resources, and the undermining of the judicial process." *Id.*

These two sanctions rulings in the *Rosenthal Collins* litigation reflect a measured approach to sanctions. Judge Moran's sanctions ruling found that the conduct of RCG was not sufficiently willful or destructive of the litigation process to warrant the ultimate penalty of a default judgment, but imposed significant sanctions that were tailored to address both merits and economic prejudice caused by RCG's conduct. By contrast, when the issue came before Judge Coleman several years later, she found it appropriate to enter a default judgment where further evidence demonstrated that RCG had forfeited its right to a decision on the merits by altering and destroying evidence, conduct that undermined the integrity of the legal process.

In this case, the conduct of Sears does not even begin to approach the misconduct in *Rosenthal Collins* that led Judge Coleman to impose a default judgment. We find the conduct

16

here in more akin to what Judge Moran faced: a summary judgment motion premised, in part, on materials that had not been produced earlier in the litigation. Based on the record before him at the time, Judge Moran found that striking RCG's summary judgment motion, allowing certain further discovery, and awarding fees to compensate Trading Technologies for fees it unnecessarily incurred were enough to address any prejudice to Trading Technologies. In this case, we find that those sanctions would be fully effective to redress on a prejudice to MemberSelect from the failure of Sears to disclose the information at issue when it should have done so.

In seeking a default judgment, MemberSelect cites a number of cases which we find distinguishable. In *Hindmon v. National Ben Franklin Life Insurance Corp.*, 677 F.2d 617 (7th Cir. 1982), the Seventh Circuit affirmed that district court's entry of a default judgment against *Hindmon* which was based on a long course of discovery abuse and failure to provide discovery. As we have explained, Sears has not displayed any such pattern of discovery abuse in this case. MemberSelect also cites *Charterhouse Insurance Brokers, Ltd. v. New Hampshire Insurance Company*, 677 F.2d 600 (7th Cir. 1981), in which the Seventh Circuit affirmed the dismissal of a suit based on repeated missed deadlines and a failure to timely disclose documents. In affirming the dismissal, the Seventh Circuit explained that the plaintiff's consistent refusal to provide discovery had compromised the defendant's ability to litigate the matter. *Id.* at 605. The conduct of Sears in this case, again, does not approach that level of severity and has not irretrievably compromised the ability to have a fair adjudication of the claims on the merits.

Finally, we are wary of imposing a sanction that would give MemberSelect a victory and deprive Sears of a determination on the merits when the discovery shortcomings can be remedied through other means, and when the additional information provided in no way guarantees that

17

MemberSelect will win the case on the merits. We have no difficulty concluding that the information MemberSelect did not timely receive is relevant, and that any good attorney would want to have that information in hand to probe and test assertions by Sears of lack of knowledge of the alleged defect. But, that information does not, on its face, strike as a "smoking gun" that establishes that Sears in fact had knowledge of any alleged defect (much less that the "alleged" defects were in fact "real" defects). The shortcomings of Sears in providing relevant discovery do not entitle MemberSelect to a technical knock-out; if MemberSelect is to prevail in the case, it will have to do so by proving its case on the merits.[1]

## CONCLUSION

For the foregoing reasons, we respectfully recommend that MemberSelect's Motion for Sanctions (doc. # 123) be granted. We recommend that the following sanctions should be imposed: (1) Sears's pending Motion for Summary Judgment (doc. # 110) should be stricken without prejudice, and with leave to refile at a later date to be set by the Court; (2) MemberSelect should be permitted to take the deposition of Mr. Lee; to further depose Messrs. Netzer, Skarzyknski and Francowski (in his Rule 30(b)(6) capacity), limited to questions based on the relevant UTC and Supply Agreement terms; (3) MemberSelect should be allowed to depose an additional Rule 30(b)(6) witness about Sears's enforcement of (or failure to enforce) its contractual rights under those agreements with respect to the manufacture, testing, production, servicing, and installation of the Kenmore dyers; and (4) Sears should be required to pay

---

[1] We also note that entry of a default judgment against Sears would run the risk of adversely affecting its co-defendant, Electrolux. As we have noted, Sears has filed a motion asking to assert a cross-claim for indemnity from Electrolux for any judgment it may have to pay to MemberSelect. Entry of a default judgment against Sears would inject into the case the question of whether any indemnity obligation that Electrolux might owe to Sears would be triggered by a judgment that results from a sanctions ruling rather than a decision on the merits.

MemberSelect its reasonable attorneys' fees and costs incurred with respect to briefing on the summary judgment motion and to pursuing the sanctions motion.[2]

Specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this Order is served. Fed. R. Civ. P. 72(b). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation. *See Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED:   September 3, 2015

---

[2] The district judge's referral to this Court asked us to consider only the motion for sanctions which, as is plain from the sanctions we recommend, implicates Sears's summary judgment motion. In our view, the issues raised by MemberSelect in its sanctions motion do not implicate any issues raised by Sears's motion for leave to file a cross-claim against Electrolux.

19